Borden Company, Respondent, v. McDowell and another, Appellants.

Wright & Wagner Dairy Company, Respondent, v. Same, Appellants.

*October 6—November 3, 1959.*

248

For the appellants the cause was argued by *Robert J. Vergeront* and *Albert O. Harriman,* assistant attorneys general, with whom on the brief was *John W. Reynolds,* attorney general.

For the respondents there was a brief by *Shea & Hoyt,* attorneys, and *Ralph M. Hoyt* of counsel, all of Milwaukee; *Joseph A. Greaves* of Chicago, Illinois, of counsel, for the Borden Company; *Walter L. Dilger* of Chicago, Illinois, of counsel, for the Wright & Wagner Dairy Company; and oral argument by *Mr. Hoyt* and *Mr. Greaves.*

A brief was filed by *Schubring, Petersen, Sutherland & Axley* and *Floyd A. Brynelson,* all of Madison, as *amici curiae.*

BROWN, J. For convenience we will speak as though there is only one action and one appeal before us.

Appellant's first argument is that the action is not a proper one for declaratory judgment because the respondents have not yet been prosecuted for violation of the stat-

ute nor has appellant threatened them with prosecution. The appellant is duty-bound to enforce these statutes. That enforcement would greatly interfere with respondents' marketing practices of long standing. In *Petition of State ex rel. Attorney General* (1936), 220 Wis. 25, 28, 264 N. W. 633, in taking jurisdiction, we said:

"The whole philosophy underlying the Uniform Declaratory Judgments Act is that it enables controversies of a justiciable nature to be brought before the courts for settlement and determination prior to the time that a wrong has been committed or threatened. (Borchard, Declaratory Judgments, p. 3.) No court takes jurisdiction under the Uniform Declaratory Judgments Act of a subject matter of which it would not have jurisdiction in a remedial action. The Uniform Declaratory Judgments Act merely authorizes the court to take jurisdiction at a point earlier in time than it would do under ordinary remedial rules and procedure."

Appellant's statutory duty of enforcement presents the threat to respondents' business even though appellant has not yet moved against them. We consider that the allegations of the complaint warrant relief by declaratory judgment. In this we agree with the learned trial court.

We pass then to the merits. All acts of the legislature are presumed to be constitutional until established otherwise by a competent tribunal. *State ex rel. Broughton v. Zimmerman* (1952), 261 Wis. 398, 411, 52 N. W. (2d) 903; *State v. Stehlek* (1953), 262 Wis. 642, 645, 56 N. W. (2d) 514. The party attacking the statute has the burden of overcoming the presumption and showing that the statute is unconstitutional. *State v. Stehlek, supra*. Respondents have presented evidence that for many years past they and wholesalers of selected dairy products in general (including wholesalers who now appear by *amici curiae* in defense of the statutes) have pursued the practices which the statute now condemns. Respondents contend that these prac-

tices, by assisting the retailer, have promoted the healthy growth of the dairy industry with great benefit to each intermediate participant in the industry and to the public, and that these practices have had neither intention nor tendency to monopolize the wholesale commerce in selected dairy products nor to reduce competition in that or other fields. They may be right. Respondents produced testimony which would warrant such conclusions. The trial judge agreed with respondents, as the findings of fact, *supra*, show. It would be difficult, indeed, for us to say that the findings are contrary to the great weight and clear preponderance of the evidence. Probably we would feel unable to reverse the learned trial court if this appeal could be decided by the preponderance-of-the-evidence principle which governs us in findings of ordinary questions of fact.

But we have here something quite different. The enactment of these statutes is an attempt by the legislature to exercise the police power of the state to promote the public welfare. The weight of the evidence pro and con does not conclude the legislative judgment as it may conclude the appellate court in the usual case.

"The reasons for a given statute are for the legislature, if there are any which can fairly have weight. They are not for the courts. The latter have no control over the validity of a law unless they can say with substantial certainty that no argument or consideration of public policy exists which could have weight with any reasonable and honest man. If any such argument or reason can be suggested, its weight or sufficiency is not debatable in the courts. The existence of legitimate and adequate reasons for any law should not lightly be denied. Human minds differ, and what may seem inadequate or irrelevant to one may seem cogent to another. One is not justified, therefore, in assuming that all who differ from him are unreasonable or are not acting in good faith. It is from such considerations as these that the courts

have laid down for themselves the rule that only in a clear case—clear beyond reasonable doubt—will they venture to assert that a law is without reason to support either its purpose or the classifications it may make." *State ex rel. Kellogg v. Currens* (1901), 111 Wis. 431, 438, 87 N. W. 561.

"If there is any reasonable basis upon which the legislature may constitutionally rest, the court must assume that the legislature had such fact in mind and passed the act pursuant thereto. The court cannot try the legislature and reverse its decision as to the facts. All facts necessary to sustain the act must be taken as conclusively found by the legislature, if any such facts may be reasonably conceived in the mind of the court." *State ex rel. Carnation M. P. Co. v. Emery* (1922), 178 Wis. 147, 160, 189 N. W. 564.

The challenged statutes forbid a variety of aids formerly given by all wholesalers to retailers whose trade the wholesaler desired. While the respondents asserted and the trial court found that the purpose of such aids was solely to stimulate the sale of selected dairy products to the consumer and that none of the practices tended to promote monopoly or unfairly to divert trade from smaller wholesalers to larger ones, there is substantial evidence to the contrary.

For instance: When plaintiff Wright & Wagner Dairy Company bought from Piggly Wiggly all the latter's ice-cream cabinets and agreed to furnish all the necessary refrigeration in the Piggly Wiggly stores, Piggly Wiggly shifted its ice-cream business to Wright & Wagner. When the Borden Company supplied the Kroger chain stores with ice-cream cabinets to be used only for Borden products, Borden obtained the Kroger ice-cream account. Wright & Wagner made a loan of $2,050 to one Ruffalo, a retailer. Before that Ruffalo had bought his ice cream elsewhere. After Wright & Wagner made him the loan, Ruffalo got his ice cream from Wright & Wagner.

The various aids by wholesalers to retailers of the sort referred to in the statute, if unrestricted, may be and in fact sometimes are actual subsidies. It is perfectly apparent that at the retail level an unsubsidized dealer having only a comparable article cannot compete with one who is subsidized. In the same way, to retain the competitive advantage of the subsidy the retailer will give his business to the wholesaler which can or will furnish the aid. At least it is conceivable that a legislature may think so, and not without reason; and the legislature may conclude that the tendency is to monopolize the wholesale commerce in selected dairy products and eventually eliminate the wholesalers who have good merchandise but who are unable to meet subsidized competition. This, we think, the legislature may reasonably consider incompatible with the public welfare.

We conclude that the unregulated practices referred to in these statutes, such as the extension of unlimited credit, the making of loans, the wholesaler's advertisement of the retailer's business, the gift or loan of essential retailing fixtures and equipment, the gift of secret rebates and discounts given to favored retailers by wholesalers in consideration of the retailer's business may, in the judgment of the legislature, be considered unfair trade practices, and regulated in the promotion of the public welfare.

The legislature may honestly and reasonably conceive that the prohibition of such practices or the regulation of them as the statute provides will enable smaller or less-wealthy wholesalers to compete for the retailer's trade and therefore to continue to function in the economy of the transfer of the product of the dairy farmer to its ultimate conversion and sale in the form of selected dairy products. Respondents make the objection that those regulatory provisions are enacted for the benefit of a class, the "small wholesalers," and not for the general public welfare. We

held this objection was not valid when we said in *Kuhl Motor Co. v. Ford Motor Co.* (1955), 270 Wis. 488, 502, 71 N. W. (2d) 420:

"The fact that the persons to be benefited by this regulatory measure are confined to one class of our citizens, auto dealers, does not militate against the same being a legitimate exercise of the police power. As the Connecticut court recently stated in *Amsel v. Brooks* (1954), 141 Conn. 288, 297, 106 Atl. (2d) 152, 157, 45 A. L. R. (2d) 1234, 1241:

" 'A statute which is otherwise within the police power or serves a public purpose is not unconstitutional merely because it incidentally benefits a limited number of persons.'

"While all the citizens of the state are entitled to be protected against unfair dealing by others, this does not mean that the legislature must by one sweep prohibit all unfair dealing and cannot proceed piecemeal to remedy particular types of unfair dealing which manifest themselves in particular occupations or industries."

Whether the statutory prohibitions and regulations are the most-effective ways of avoiding the evil or whether worse evils may flow from such regulation the court cannot be concerned.

"With the wisdom of the policy adopted, with the adequacy or practicability of the law enacted to forward it, the courts are both incompetent and unauthorized to deal. The course of decision in this court exhibits a firm adherence to these principles. Times without number we have said that the legislature is primarily the judge of the necessity of such an enactment, that every possible presumption is in favor of its validity, and that though the court may hold views inconsistent with the wisdom of the law, it may not be annulled unless palpably in excess of legislative power." *Nebbia v. New York* (1934), 291 U. S. 502, 537, 54 Sup. Ct. 505, 78 L. Ed. 940.

We can, of course, examine into the constitutionality of the methods chosen by the legislature. In the *Nebbia*

*Case, supra,* the United States supreme court, in sustaining the regulation of milk prices, said (pp. 538, 539) :

"The constitution does not secure to anyone liberty to conduct his business in such fashion as to inflict injury upon the public at large, or upon any substantial group of the people. Price control, like any other form of regulation, is unconstitutional only if arbitrary, discriminatory, or demonstrably irrelevant to the policy the legislature is free to adopt, and hence an unnecessary and unwarranted interference with individual liberty."

We cannot find here that the presumptions in favor of adequate reasons and choice of methods which attach to legislative acts have been overcome by respondents and these statutes are arbitrary, discriminatory, or demonstrably irrelevant to the policy the legislature is free to adopt.

The respondents and the trial court point out that these aids to retailers by wholesalers are of long standing. But—

"It is to be remembered that we are dealing with one of the most essential powers of government, one that is the least limitable. It may, indeed, seem harsh in its exercise, usually is on some individual, but the imperative necessity for its existence precludes any limitation upon it when not exerted arbitrarily. A vested interest cannot be asserted against it because of conditions once obtaining." *La Crosse Rendering Works v. La Crosse* (1939), 231 Wis. 438, 448, 285 N. W. 393.

Respondents contend that these statutes deprive them of freedom of contract—a property right. We have often upheld statutes which restrict long-continued freedoms to make contracts in the course of their business where the legislature has determined that the public welfare requires restriction. Statutes prohibiting contracts for interest in excess of certain rates for the use of money are well-nigh universal. In *State ex rel. Finnegan v. Lincoln Dairy Co.* (1936), 221 Wis. 1, 265 N. W. 197, 265 N. W. 851, citing

the *Nebbia Case, supra,* we sustained statutory restrictions on the prices to be paid for milk. In *State v. Ross* (1951), 259 Wis. 379, 48 N. W. (2d) 460, we sustained sec. 100.30, Stats., restricting sales of merchandise at prices less than cost, the loss-leader statute. And see *Kuhl Motor Co. v. Ford Motor Co., supra,* pages 502, 503.

The learned trial court was influenced by the decision of *Fairmont Foods Co. v. Burgum* (N. D. 1957), 81 N. W. (2d) 639. There the North Dakota court declared unconstitutional a statute very similar to the ones which are now before us. In spite of the respect which we pay to the court of our sister state we think their decision does not accord with our established precedents in recognizing facts and purposes which Wisconsin courts must assume that the legislature had in mind. The references to *State ex rel. Kellogg v. Currens, supra,* and *State ex rel. Carnation M. P. Co. v. Emery, supra,* show our adoption of those principles when the court examines the constitutionality of legislation and the *Nebbia Case, supra,* shows their adoption by the supreme court of the United States. They are inconsistent, we think, with the North Dakota decision to which our learned trial court gave so much weight and we feel bound by our own precedents.

Governed by such precedents, we conclude that the dairy industry is subject to regulation and has been regulated so by the legislature for the public welfare for many years. The present statutes seem to us to be of the nature of those which we have previously sustained as constitutional.

The monopolistic tendencies in merchandising practices which the legislature perceived and believed to be inconsistent with the public welfare were not mere bogies under the bed but were beliefs based on facts which reasonable and honest men could entertain even if other men equally honest and reasonable might see the facts differently and reach different conclusions. The prohibitory and regulatory meth-

ods chosen by the legislature are not inappropriate to the public purpose sought by the legislature to be accomplished.

Respondents find uncertainties in the application of the law. We do not find that there are necessarily the alleged uncertainties. That may or may not appear when attempts are made in enforcement. In the meantime we should wait until there are concrete facts rising from the application of the statute. If unconstitutional applications are attempted, the courts must deal with them at that time.

"In the construction of statutes it is generally held that they should not be held to be too indefinite to be operative because they contain terms not susceptible of exact meaning, or are imperfect in their details, or where they employ words commonly understood. 50 Am. Jur., Statutes, p. 489, sec. 473. A statute should not be pronounced void for uncertainty if it is susceptible of any reasonable construction. *Wentworth v. Racine County* (1898), 99 Wis. 26, 74 N. W. 551. No reason appears why these rules should not be applied to orders of an administrative agency. They should be given effect if by any reasonable rule of construction they are capable of administration and enforcement." *Madison Bus Co. v. Public Service Comm.* (1953), 264 Wis. 12, 14, 58 N. W. (2d) 463.

We consider that the statutes now before us are capable of constitutional administration and enforcement. We sustain the constitutionality of secs. 100.201, 100.202, Stats.

*By the Court.*—Judgments reversed.